CANAL-COMMERCIAL TRUST & SAVINGS BANK *v.* BREWER.*

(Division A. Feb. 15, 1926.    Suggestion of Error Overruled May 31, 1926.)

[108 So. 424.    No. 25200.]

1. USURY. *Loan was made usurious by requiring borrower, in addition to contracting to pay highest legal rate, to sign as indorser note of another held by lender (Civil Code, Louisiana. Articles 1893, 2924).*

For lender to require borrower, in addition to contracting for highest legal rate of interest, to sign as indorser note of another held by lender, and pledge security for both, makes contract usurious, and the indorsement and security therefor unenforceable, under Civil Code, Louisiana 1900, articles 1893, 2924.

2. ESTOPPEL.

Defendant has burden of proof on defense of estoppel.

3. ESTOPPEL.

Estoppel must arise from some word spoken, act done, or failure to speak when called on to speak.

4. USURY. *Borrower required to indorse notes of another as condition of loan held not estopped to set up usury.*

Where a bank loaning money to B. on his notes required not only the highest legal rate of interest but that B. indorse the notes

of H. held by the bank, no estoppel of B. to claim usury against the indorsement is shown by testimony of representative of bank which handled at a profit bonds of B's company, from which he got money with which to pay his notes, that it would not have handled them had it known that B. would contest his indorsement of H.'s note.

5. USURY. *Contract held not relieved of usury by renewal of note.*
   Contract whereby bank loaning to B. required him not only to give notes bearing highest legal rate of interest, but to indorse note of H. held by it, was not relieved of charge of usury by B's giving renewal note; the bank continuing to carry B.'s indorsement of H.'s note, and also to require B. to pay the highest legal rate.

6. SET-OFF AND COUNTERCLAIM. *Set-off is not available where defendant totally denies complainant's right of action.*
   Set-off, applicable only in case of mutual indebtedness, is not available where defendant makes total denial of complainant's cause of action.

---

*Corpus Juris-Cyc References:  Appeal and Error, 4CJ, p. 917, n. 33. Estoppel, 21CJ, p. 1119, n. 13; p. 1250, n. 82.  Evidence, 22CJ, p. 73, n 72.  Recoupment, Set-Off and Counterclaim, 34Cyc, p. 665, n. 48; p. 712, n. 15; p. 715, n. 23.  Usury, 39Cyc, p. 985, n. 87 New; p. 1003, n. 16; p. 1022, n. 36.

APPEAL from chancery court of Coahoma county.
HON. C. L. LOMAX, Chancellor.

Suit by Earl Brewer against the Canal-Commercial Trust & Savings Bank.  From decree for complainant, defendant appeals.  Affirmed.

*Oscar Johnston* and *F. H. Montgomery,* for appellant.

*The indorsement by appellee of the W. P. Holland note was supported by sufficient consideration and rendered appellee liable thereon.* The court below held that there was no consideration for the indorsement by the appellee of the note of W. P. Holland and, therefore, the same was not binding upon the appellee.  The court below was in error.

The pledge contract executed by the appellee to the appellant on February 1, 1921, which contract was written by the appellee, provided as follows: "That all of said securities are cumulative and intended to secure the three hundred twenty-five thousand dollars owed by the party of the first part to the party of the second part, and is also pledged as collateral to secure the payment of balance of two hundred sixty-eight thousand five hundred forty dollars and eighty-three cents owed by W. P. Holland to the party of the second part, on which note the party of the first part is indorser, and is also intended to secure any other indebtedness that the party of the first part may owe to the party of the second part."

The Bobo notes and the Gates notes, which constitute the subject-matter of this litigation, were a part of the securities referred to in the said contract. It will thus be seen that it was expressly stipulated that these notes should stand as collateral to secure the payment of the W. P. Holland note on which the appellee was indorser. Unless this indorsement was invalid, and the pledge contract referred to invalid, undoubtedly the appellant has the right to retain the Bobo and the Gates notes until the balance due on the Holland note is paid in full.

Immediately preceding the closing of the several transactions then pending between Brewer and the appellant, appellee was repudiating, or seeking to repudiate, his liability on these notes; and the appellant was contending that he was liable to it because of his indorsement thereof. Thereupon, the appellee drafted a contract, which was signed by the appellant and the appellee, and which appellee says he "required the appellant" to enter into before he would close the transaction. The effect of this contract was as follows:

The appellee indorsed the Holland note. The appellant cancelled and surrendered appellee's note for two hundred thousand dollars, and released the Bobo and Gates notes, the subject of this litigation, which were held as collateral to the said two hundred thousand dol-

lars. Thereupon the appellee made new notes to appellant for three hundred twenty-five thousand dollars, payable one year from date, bearing interest at the rate of eight per cent per annum, and pledged as collateral thereto the Bobo and Gates notes and agreeing: "that all of said securities are cumulative and intended to secure the three hundred twenty-five thousand dollars owed by the party of the first part to the party of the second part, and is also pledged as collateral to secure the payment of the balance of two hundred sixty-eight thousand five hundred forty dollars and eighty-three cents owed by W. P. Holland to the party of the second part, on which note the party of the first part is indorser, and is also intended to secure any other indebtedness that the party of the first part may owe to the party of the second part."

After new notes aggregating three hundred twenty-five thousand dollars were executed by the appellee, there was applied as a credit on the Holland note, with the consent of the appellee, an amount equal to the amount of the principal and interest due on the two hundred thousand dollar note of appellee and the twenty-five thousand dollar note of appellee and Ed Brewer, which were released as collateral by the appellant from the Holland note, reducing the amount of the indebtedness on the Holland note to two hundred sixty-eight thousand five hundred forty dollars and eighty-three cents.

No question was ever raised by the appellee about his liability to the appellant on account of his indorsement of the Holland note until after the bond issue of the Tchula Co-Operative Stores Company lands had been bought by the appellant and the Hibernia Bank of New Orleans, and appellee had received the full benefit arising therefrom. Then the appellant requested a renewal of his indorsement of the Holland note, which was long past due, and then the appellee, for the first time, questioned his liability on this note as indorser, and declined to renew the same.

The appellee contended, and the court below so held, that the indorsement of the Holland note by the appellee was without consideration, and did not constitute an indebtedness from appellee to appellant. In this we think the court below erred, both in law and in fact.

We are not contending that any contract of whatsoever nature need not be supported by a consideration. This is a principle of law universally recognized. But the questions involved here are (1) What constitutes a consideration? and (2) Was there such an act done in connection with the indorsement by the appellee of the Holland note as is recognized in law as a consideration? For definitions of the word "consideration," which are pertinent to the question here raised, see: Neg. Instr. Law, section 2603, Hemingway's Code; *Magee* v. *Catchings,* 33 Miss. 672; *Byrne* v. *Cummings,* 41 Miss. 192; *Duff* v. *Snider,* 54 Miss. 245; *Long* v. *Shackelford,* 25 Miss. 559; *Field* v. *Weir,* 28 Miss. 54; *Ableman* v. *Haehnel,* 103 N. E. 69; *Leakeville Institute* v. *Mevane,* 81 S. E. 1020; *State* v. *Hillis,* 113 N. E. 1045, L. R. A. 1917-B 684; *Cherokee County* v. *Meroney,* 173 N. C. 653, 92 S. E. 616; *St. Marks Church* v. *Teed,* 120 N. Y. 583, 24 N. E. 1014; *Mascolo* v. *Montevanto,* 29 A. S. R. 171.

It will be seen; therefore, that loss, injury, trouble, inconvenience, damage or detriment, even though trifling, and notwithstanding it does not inure to the benefit of the promisor, is a sufficient consideration.

It was the contention of the appellee in the court below that when the appellee executed his notes to the appellant on February 1, 1921, for three hundred twenty-five thousand dollars, and agreed to pay as interest thereon the highest legal rate of interest, his consenting in addition thereto to indorse the Holland note to the appellant constituted usury, and his indorsement of the Holland note was, therefore, void.

If the circumstances involved nothing more than a naked loan from appellant to appellee, for which the highest legal rate of interest was charged, and in addi-

tion thereto the maker was required to indorse the note of another, which he was under no legal or moral obligation to pay, and there were no other transactions connected therewith, this contention might be presented with some plausibility.

But the situation here is a wholly different one. It did not involve merely the making of the loan. The making of the loan of three hundred twenty-five thousand dollars was only one of several transactions. At the time in question, the appellant was the holder of five of the Glidden & Townsend notes and one of the McNally notes, on which the appellee was an indorser, for the principal sum of two hundred forty-one thousand four hundred dollars, with more than one year's accrued interest. The appellant also held the personal note of appellee for two hundred thousand dollars secured by the Bobo and Gates notes, and also held the note of appellee and Ed Brewer for the principal sum of twenty-five thousand dollars, both of which said notes were past due, and with more than a year's interest due thereon. All of these notes had been pledged as collateral security to the W. P. Holland note for five hundred thousand dollars.

The notes on which appellee was liable to appellant at the time evidenced an indebtedness in an amount in excess of the Holland note to which they were collateral.

The appellee was not merely seeking to procure a loan from the bank. He was seeking, in addition to this, a renewal of his indebtedness of two hundred twenty-five thousand dollars, evidenced by his personal note of two hundred thousand dollars and the joint note of Ed Brewer and himself for twenty-five thousand dollars, with an additional loan of one hundred thousand dollars for current business purposes. He was seeking to enlist the offices of the bank in the matter of shifting the Bobo and Gates notes, with a long list of other collaterals, which the testimony shows to have been worthless, from the Holland note to a personal note, which he proposed to

make to the bank, for the sum of three hundred twenty-five thousand dollars. In fact, he was calling upon the bank to re-arrange his finances entirely so that he might be relieved of a present necessity of paying his obligations amounting to two hundred twenty-five thousand dollars and interest, which were then past due, and procuring one hundred thousand additional cash money. He was calling upon the bank to recast and re-adjust his finances so that he might continue in business. The appellant and the appellee were not the only persons interested in these transactions. W. P. Holland, who had pledged the two Brewer notes for two hundred twenty-five thousand dollars with the bank as collateral with his five hundred thousand dollar note, had rights therein which the bank had to respect and protect.

By his indorsement of the Holland note, it appeared that he would not incur any greater indebtedness than he was already liable for, as his liability on account of his personal notes and notes on which he was indorser already equalled or exceeded the principal of the Holland note. By indorsing the Holland note he gained a right of subrogation as indorser to the rights of the Canal Commercial Trust & Savings Bank to a long list of collaterals underlying the Holland notes other than the notes on which appellee was liable, in the event that he should be called upon to pay the notes. This was a valuable right which he did not have before his indorsement.

Then, whether his contention that he had been discharged from liability on account of his indorsement of the Glidden & Townsend and the McNally notes was valid or invalid, this being a disputed issue between the parties, by indorsing the Holland note, he waived this contention, recognized his liability on the Glidden & Townsend notes, placed himself in good standing with the bank, and thus enabled the bank to consummate his wishes, to-wit; the postponement for a year of the payment of the two Brewer notes, amounting to two hundred twenty-

five thousand dollars, which were then past due, and making a loan to him of an additional one hundred thousand dollars. "A compromise of disputed matter is a sufficient consideration for a contract and will bind both parties to the settlement when made without fraud." *Long* v. *Shakelford,* 25 Miss. 559; *Field* v. *Weir,* 28 Miss. 56.

Can it be thought for a moment that this rather elaborate plan, conceived in the minds of a city banker and an eminent lawyer and financier, was a dog-fall—that is, resulting in neither a benefit to the promisor nor a detriment to the promisee? See 6 R. C. L. 678.

There is another rule at law which is pertinent to a decision of this issue; that is, if there be doubt as to whether the indorsement of the Holland note by the appellee is in violation of the statutes against usury, this doubt must be resolved in favor of the legality of the contract. The law never presumes inequity. It will not be presumed in this case that a banker and a lawyer-financier deliberately conspired together to perpetuate a violation of the usury law. 6 R. C. L. 839; *Wyatt* v. *Larimer, etc., Irr. Co.,* 18 Colo. 298, 33 Pac. 144, 36 A. S. R. 280; *Equitable Loan, etc., Co.* v. *Warring,* 117 Ga. 599, 44 S. E. 320, 97 A. S. R. 177, 62 L. R. A. 93; *Garrigue* v. *Keller,* 164 Ind. 676, 74 N. E. 523, 108 A. S. R. 324, 69 L. R. A. 870; *Cole* v. *Brown-Hurley Hardware Co.,* 139 Ia. 487, 117 N. W. 746, 16 Ann. Cas. 846, 19 L. R. A. (N. S.) 1161; *Hubbard* v. *Miller,* 27 Mich. 15, 15 Am. Rep. 153; *Smythe* v. *Allen,* 67 Miss. 146.

Even if you construe the transactions as appellee contends for; viz., a simple loan of three hundred twenty-five thousand dollars, providing for the payment of the highest legal rate of interest, and in addition thereto the indorsement of the Holland note, it is a valid transaction. Brewer was already obligated to pay the Holland note on account of the paper on which he was liable, which was pledged as collateral thereto; and he suffered no detriment in agreeing to do, by indorsing the Holland note,

what he ought to do in lieu of paying the debt.    For cases in point, see:   *Southern Trading Co.* v. *Bank of Ft. Worth,* 78 S. W. 644; *Wilson* v. *Russell,* 71 Am. Dec. 645; *Jarvis' Appeal,* 27 Conn. 432; *Marsh* v. *Howe,* 36 Barb. (N. Y.) 649; *Brooklyn Bank* v. *Waring,* 2 Sandf. ch. 1.

A pre-existing debt constitutes a sufficient consideration for a pledge of collaterals to secure it.   21 R. C. L. 640; *Spencer* v. *Sloan,* 108 Ind. 183, 9 N. E. 150, 58 Am. Rep. 35; *Nat'l Bank* v. *Dakin,* 54 Kan. 656, 39 Pac. 180, 45 A. S. R. 299 and note; *Shumway* v. *Reed,* 34 Me. 560, 56 Am. Dec. 679; *Baltimore Third Nat'l Bank* v. *Boyd,* 44 Md. 47, 22 Am. Rep. 35; *State Banking, etc., Co.* v. *Taylor,* 25 S. D. 577, 127 N. W. 590, 29 L. R. A. (N. S.) 523.

By section 2603, Hemingway's Code, the Negotiable Instruments Act, provides:   ''An antecedent or pre-existing debt constitutes value; and is deemed such whether the interest is payable on demand or at a future date.''

If, being indebted on account of negotiable paper held as collateral to the Holland note, appellee tendered security for the note so held, his pre-existing indebtedness and liability furnishes sufficient consideration therefor. *Nat'l Bank* v. *Dakin,* 45 A. S. R. 299; *Shumway* v. *Reed,* 56 Am. Dec. 679; *State Banking & Trust Co.* v. *Taylor,* 29 L. R. A. (N. S.) 523; *Gavonnovitch* v. *Citizens Bank,* 26 La. Ann. 15; *Succession of Dalbande,* 21 La. Ann. 3; *Louisiana State Bank* v. *Gosmire,* 21 La. Ann. 555; *Smith* v. *Issacs,* 23 La. Ann. 454.    For interesting and exhaustive discussion of this question, see Jones on Collateral Securities, sections 107-133.

The transferring of the collaterals to the Holland note, to a new note then about to be executed by the appellee, and at the solicitation of the appellee, the surrendering of the Ed Brewer note, releasing Ed Brewer from liability thereon, as well as releasing W. P. Holland from liability as an indorser thereon, was a thing which the appellant was not, legally or morally required to do;

and this of itself is a sufficient consideration for the indorsement of the note. *Leakeville Spray Institute* v. *Mevane,* 165 N. C. 664, 81 S. E. 1020. The chancellor was in error in decreeing that the indorsement of the Holland note was without consideration.

*The appellee invokes the aid of a court of equity but does not offer to do equity.*

Equity would require of appellee in this case at least the restoration of the *status* of the parties, as it existed on February 1, 1921, as a condition precedent to granting any relief to him in this case. *Dent* v. *Long,* 7 So. 640; *Pintard* v. *Martin,* S. & M., ch. 126; *Powell* v. *Plant,* 23 So. (Miss.) 399; *Deans* v. *Roberson,* 64 Miss. 195; *Pounds* v. *Clark,* 70 Miss. 263; *Salter* v. *Embrey,* 18 So. 373.

In this case the appellee offers to do nothing as a condition precedent to the relief which he seeks on account of the alleged illegality of his indorsement of the Holland note. He indorsed the Holland note after mature deliberation, in two contracts executed on February 1, 1921, solemnly affirmed his liability on account of this indorsement and specifically pledged collaterals to secure the same.

The appellee not only led the appellant to believe that he had not and would not question his liability on account of his indorsement of the Holland notes, and of his indorsement on the Glidden & Townsend, and the McNally notes; but also stated this positively to Dr. P. H. Saunders, whom he had employed as his agent to negotiate the sale of these bonds of the Tchula Co-Operative Stores to the appellant bank and the Hibernia Bank.

In *America Freehold Land & Mortgage Co.* v. *Jefferson,* 69 Miss. 770, the true rule is announced in most emphatic terms by this court, as follows: "Though a contract be usurious or void, under our laws, so that no action can be maintained, either in law or in equity, for its endorsement, a party thereto cannot invoke the aid of the chancery court to be relieved against the same un-

less he submits to do equity." See, also, *Deans* v. *Robertson,* 64 Miss. 195.

*Wells, Stevens & Jones, Cutrer & Smith, P. H. Lowrey* and *H. C. Holden,* for appellee.

A pledge contract must be construed under the laws of the state where it was made. *Lachman & Jacobi* v. *Block,* 47 L. A. Ann. 505, 28 L. R. A. 255; 13 C. J. 248; *Brown* v. *Freeland,* 34 Miss. 181; *Bank* v. *Tarleton,* 23 Miss. 173; *Partee* v. *Sullivan,* 44 Miss. 272; *Liverpool, etc., Co.* v. *Ins. Co.,* 129 N. S. 397, 32 L. Ed. 788; *Eagle* v. *Ins. Co.* (Ind.), 91 N. E. 814; *Tel. Co.* v. *Parsley* (Tex.), 121 S. W. 226.

A pledge contract is a trust in which the pledgee is the trustee and the pledgor is the *cestui que trust.* *Dibert* v. *D'Arcy,* 248 Mo. 617; *Gillett* v. *Bank of America* (N. Y.), 55 N. E. 292; *McLemore* v. *Hawkins,* 46 Miss. 715; *Smith* v. *Shipp Oil Co.* (La.), 45 So. 539; 29 Am. & Eng. Enc. of Law, page 126; 2 Pomeroy Eq. Juris., sec. 907; *Richardson* v. *Mann,* 30 La. Ann. 1060.

Since the pledgee is a trustee the burden is upon him to show that there was no fraud in the making of the contract. The existence of such a trust relation raises the presumption of fraud. 14 Am. & Eng. Ency. of Law, page 194; 31 Cyc. 870; 29 Am. & Eng. Ency. of Law, pages 125, 126; *Meek* v. *Perry,* 36 Miss. 245; Elliott on Contracts, secs. 74 and 124; 2 Pomeroy on Equity (3 Ed.), sec. 907; 22 A. & E. Enc. Law, 899-903 and note; 12 R. C. L. 305 et seq.; *Jones* v. *Loyd,* 117 Ill. 597; *Huddleston* v. *Henderson,* 181 Ill. App. 184; Hill on Trustees, page 580; 27 A. & E. Enc. Law, 460.

In procuring the endorsement of another and the pledging of collateral to secure such endorsement, the pledgee must make a full disclosure of all material facts affecting the risk, and failure so to do is a fraud which vitiates the contract. *Gano* v. *Farmers' Bank* (Ky.), 82 A. S. R. ——, 103 Ky. 508; *Commonwealth* v. *Berry,*

(Ky.), 26 S. W. 7; Story's Equity Jurisprudence, secs. 214-215, 234; *Griswold* v. *Hazard,* 141 N. S. 260, 35 L. Ed. 689; *McNeil* v. *Bay Springs,* 100 Miss. 271, 56 So. 333; Merrick's Civil Code of Louisiana, secs. 1819, 1832; 21 R. C. L., 1004; *Crompton* v. *Beadle,* 83 Vt. 287; 14 A. & E. Enc. Law, pages 68, 69, 70; 26 C. J., 1076, 1078; *Atwood* v. *Chapman* (Me.), 28 A. S. R. 5; Sugden on Vendor & Purchaser (8 Ed.), page 9; *Coles* v. *Kennedy* (Ia.), 25 A. S. R. 505; 13 C. J. 383; 26 C. J. 1071-1073; *Brown* v. *Montgomery* (N. Y.), 75 Am. Dec. 404; *Davis* v. *Heard,* 44 Miss. 57; 5 Elliott on Contracts, sec. 3938; 1 Elliott on Contracts, secs. 74, 80; Baylies on Sureties and Guarantors, pages 214, 216, 294; 2 Pomeroy on Equity Jurisprudence, sec. 907; Black on Rescission and Cancellation, sec. 58; 2 Parsons on Contracts, pages 776-777; 2 Pomeroy on Equity Jurisprudence, sec. 902; Story on Contracts, 516-521; Story on Promissory Notes, sec. 18; *Brown* v. *Lyon,* 81 Miss. 438, 33 So. 284; *Warren* v. *Branch,* 15 W. Va. 21; *Book* v. *Traub,* 6 Mo. App. 221; 1 Joyce on Defenses to Commercial Papers (2 Ed.), par. 242; *Clopton* v. *Elkin,* 49 Miss. 95; *Elting* v. *Bank,* 6 L. Ed. 419; *Bank* v. *Slyke,* 1 N. Y. S. 508; *Wooley* v. *Banking Co.,* 81 Ky. 527; *Marchman* v. *Robertson,* 77 Ga. 41; *Heath* v. *Waters,* 40 Mich. 450; *Carmichael* v. *Parks,* 116 Miss. 710; *Oswald* v. *McGehee,* 28 Miss. 340; *Hall* v. *Thompson,* 1 S. & M. 428; 13 C. J. 384 and note 42; *Lowerson* v. *Johnson,* 47 N. J. Eq. 312.

If the obligee volunteers any information concerning the surety's risk, he must make a full disclosure; otherwise the surety may avoid liability. *Magee* v. *Insurance Co.,* 92 N. S. 593, 23 L. Ed. 699; *Monroe* v. *Anderson Bros.* (Ia.), 22 N. W. 929; *Ligenfelter Bros.* v. *Bowlon* (Ia.), 137 N. W. 946; *Putrey* v. *Schmidt* (N. M.), 129 P. 720; *Domestic, etc., Co.* v. *Jackson* (Tenn.), 15 Lea 418; *Brillion Lbr. Co.* v. *Barnard* (Wis.), 111 N. W. 483; 27 A. & E. Enc. Law, 43, 460; 14 A. & E. Ency. Law, 194; 26 C. J. 1086, 1100; *Mulligan* v. *Bailey,* 28 Ga. 507; *Burns* v. *Dockery,* 156 Mass. 135; *Irving* v. *Holbrook* (Utah),

62 A. S. R. 921; *Atwood* v. *Chapman* (Me.), 28 A. S. R. 5; 1 Joyce on Defenses to Commercial Papers, par. 242.

The concealment by the pledgee or obligee need not be willful and intentional in order to constitute fraud. *Railton* v. *Matthews,* 10 Clark & F. 934, 8 Eng. Reprint 993; *Irving* v. *Holbrook* (Utah), 62 A. S. R. 921; *Harrison* v. *Ins. Co.,* 8 Mo. App. 37; *Bomon* v. *Surety Co.,* 146 N. Y. S. 996; *Bank* v. *Terry,* 135 F. 621; *Conger* v. *Bean* (Ia.), 12 N. W. 284; 27 A. & E. Enc. Law, 460; *Jung* v. *Holbrook* (Utah), 62 A. S. R. 921.

A surety who is also a pledgor may rely upon the representations of the pledgee without making his own investigation, and if fraud or concealment be later shown, it is no answer to say that the surety could have ascertained the truth by proper inquiry. *Crompton* v. *Beadle,* 83 Vt. 287; *Warren* v. *Branch,* 15 W. Va. 21; 27 A. & E. Enc. Law, 443-460; 26 C. J. 1086; 14 A. & E. Enc. Law, 69.

When there is a duty on the part of the pledgee or obligee to speak, silence is fraudulent concealment. 14 A. & E. Enc. Law, 68, 69, 70; 26 C. J. 1078; *Atwood* v. *Chapman* (Me.), 28 A. S. R. 5; Sugden, Vendor & Purchaser (8 Ed.), p. 9; Kerr on Fraud and Mistake, 99, 102; *Coles* v. *Kennedy* (Ia.), 25 A. S. R. 505; *Brown* v. *Montgomery,* 20 N. Y. 287 (citing many cases); *Davis* v. *Heard,* 44 Miss. 57; 1 Elliott on Contracts, sec. 74; Vol. 5, sec. 3938; Baylies on Sureties and Guarantors, 214, 294; *Franklin* v. *Cooper,* 36 Me. 179; *Rialtos* v. *Matthews,* 11th Clark & F. 934; 1 Joyce on Defenses to Com. Paper, sec. 233; Story on Promissory Notes, sec. 18; *Brown* v. *Lyon,* 81 Miss. 438; *Warren* v. *Branch,* 15 W. Va. 21; *Bank* v. *Traub,* 6 Mo. App. 221; *Elting* v. *Bank,* 6 L. Ed. 419; *Bank* v. *Van Slyke,* 1 N. Y. S. 508; *Bank* v. *Terry,* 135 F. 621.

A pledgee is under duty to account to the pledgor for all collaterals pledged. *Dibert* v. *D'Arcy,* 248 Mo. 617; *Richardson* v. *Mann,* 30 La. Ann. 1060; *Hogan* v. *Bank,* 182 Mo. 319; *Bank* v. *Richardson,* 156 Mo. 279; *Board-*

*man* v. *Florez,* 37 Mo. 559; *Bank* v. *Kilpatrick,* 204 Mo. 131.

Collateral pledged to secure one or more debts specified cannot be held by the pledgee to secure another debt not specified in the contract. *Bank* v. *Newman Co.,* 67 Miss. 770, 7 So. 403; *Hollis & Roy* v. *Isbell,* 124 Miss. 799, 87 So. 273; *Broom* v. *Dale,* 109 Miss. 52, 67 So. 659; 3 R. C. L. 133; *National, etc., Co.* v. *Hyde* (Miss.), 80 So. 378; *Bloodworth* v. *Jacobs,* 2 La. Ann. 24; *Chase* v. *Westware,* 5 Maul. 180; *Gordon* v. *Gonmulla & Mulcher,* 34 La. Ann. 606; *Gibbon Bros.* v. *Melican,* 28 La. Ann. 629; *Murdock & Williams* v. *Bank,* 23 La. Ann. 117; *Jarvis* v. *Rogers,* 15 Mass. 389; *Gillett* v. *Bank* (N. Y.), 55 N. E. 292; *Bank* v. *Blocher* (Tex.), 13 S. W. 961; *Lloyd* v. *Bank* (Va.), 11 S. E. 104; *Bank* v. *Trustees,* 62 Ga. 271; *Bank* v. *Smith,* 1 Ky. L. Rep. 351; *Bank* v. *Strever,* 16 Barb. 82; *Shroder* v. *Hatz's Executors,* 47 Pa. 528; 31 Cyc. 819, 820; *Fullerton* v. *Bank* (N. Y.), 17 Misc. Rep. 524; *Dresser* v. *Bank,* 136 La. 314; 21 R. C. L. 653, par. 18.

A pledge to secure every indebtedness or liability of the pledgor does not include a note of another person endorsed by the pledgor and discounted by the pledgee, nor does it include an obligation of the pledgor in some other capacity. *Fullerton* v. *Bank,* 17 Misc. (N. Y.) 524; 31 Cyc. 818-820; *St. John* v. *O'Connell* (Ala.), 7 Port. 466; *Niles* v. *Edwards,* 90 Cal. 10; *Stewart* v. *Lewis,* 72 La. Ann. 37, 6 So. 898; *Bank* v. *Loeb,* 27 La. Ann. 110; *Bank* v. *District* (Ga.), 76 S. E. 179; *Newman* v. *Bank,* 67 Miss. 770, 7 So. 403; *Dresser* v. *Bank,* 136 La. 314; *Breed* v. *Wood,* 7 La. Ann. 35.

The indorser of a note is discharged where the note is materially changed subsequent to the indorsement. Secs. 2689 and 2703, Hemingway's Code; *Burgess* v. *Blake,* 86 A. S. R. 80 (and note); *Bank* v. *Cole,* 111 Miss. 39, 71 So. 260; 21 R. C. L. 1004; *Spriggs* v. *Bank,* 10 L. Ed. 419; *Grossly* v. *Stanley,* 84 A. S. R. 321; *Mayhew* v. *Boyd,* 59 Am. Dec. 101; *Reese* v. *N. S.,* 19 L. Ed. 541; *Schister* v. *Weiss,* 19 L. R. A. 182; *People* v. *Villas,* 93 Am. Dec. 521;

*Martin* v. *Thomas,* 16 L. Ed. 689; *Smith* v. *U. S.,* 17 L. Ed. 788; *Miller* v. *Stewart,* 6 L. Ed. 189.

Whatever discharges the surety or guarantor also discharges the property pledged to secure the debt of another. 22 A. & E. Enc. Law, 908; 4 Elliott on Contracts, sec. 3052; 21 R. C. L. 1003; Brandt on Suretyship (2 Ed.), sec. 34; Colebrook on Collateral Security, sec. 239; *Valentine* v. *Banking Co.,* 133 Cal. 191; *Price* v. *Bank,* 124 Ill. 317; *Mitchell* v. *Roberts,* 17 F. 776; *Rowon* v. *Sharp Co.,* 33 Conn. 18; *White* v. *Ault,* 19 Ga. 551; *Crawford* v. *Richardson,* 101 Ill. 357; *Ryan* v. *Shawneetown,* 14 Ill. 20; *Christner* v. *Brown,* 17 Iowa, 130; *Burnap* v. *Bank,* 96 N. Y. 125; *Bank* v. *Burns,* 46 N. Y. 170.

The indorsement of a note after delivery is a separate contract requiring a distinct and separate consideration, and the burden is upon the holder to show that such consideration was given. 8 C. J. 868; *Garrett* v. *Butler,* 33 S. C. L. 193; *Good* v. *Martin,* 95 N. S. 90, 24 L. Ed. 341; *Canal Bank* v. *Hogen,* 1 La. Ann. 68; *Clopton* v. *Hall,* 51 Miss. 482; *Moies* v. *Bird,* 11 Miss. 436; *Cowan* v. *Hudson,* 105 Miss. 507; *Bank of Latting* (Okla.), 44 L. R. A. (N. S.) 481 and note; 7 Cyc. 738; 22 A. & E. Enc. Law, 852; *Bank* v. *Tie Co.,* 136 Miss. 114, 101 So. 292; 3 R. C. L. 928, pars. 123, 124; *Killian* v. *Ashley* (Ark.), 91 Am. Dec. 519; *Robertson* v. *Powell* (Mass.), 35 A. S. R. 466; 1 Joyce on Defenses to Com. Paper, pp. 480, 581; *Sales Co.* v. *Grant,* 135 Minn. 208, 160 N. W. 676; *Ailes* v. *Miller* (Ind.), 100 N. E. 475; *Skinner* v. *Mahoney* (Miss.), decided Nov. 2, 1925; 39 Cyc. 984 and note; 27 R. C. L. 211; 29 A. & E. Enc. Law, 510; *Rogers* v. *Peters,* 135 Miss. 758.

Where the maximum rate of interest is charged, the exaction of any further profit or advantage from the maker of a note is usurious and invalidates the contract. *Canal Bank* v. *Hagen,* 1 La. Ann. 68; *Owens case,* 2 Peters 537; *Schober* v. *Houser,* 4 Dev. & B. 90; *McKesson* v. *McDowell,* 4 Dev. & B. 120; *Turner* v. *Young* (Ind.), 89 Am. Dec. 508; *Miller* v. *Ins. Co.,* 118 N. C. 612, 54 A. S. R. 741; *Bank* v. *Cook* (Ark.), 46 A. S. R. 171; Mer-

rick's Civil Code of Louisiana, secs. 2923, 2924; *Miller v. Ins. Co.* (N. C.), 24 S. E. 484; Note 53 L. R. A. 466; 27 R. C. L., 242, par. 45; *Land Co.* v. *Jefferson,* 69 Miss. 770, 12 So. 464; *Bishop* v. *Bank* (Ga.), 41 S. E. 45; 1 Williston on Contracts, pars. 134, 1780; *Cobb* v. *Cowdery* (Vt.), 95 Am. Dec. 370; 1 Joyce, Defenses to Com. Paper, 580, 581; *Rogers* v. *Rivers,* 135 Miss. 758.

One who indorses a note subsequent to its delivery is not a co-maker but his liability is secondary, and this rule is not changed by the Negotiable Instruments Law. *Martin & Son* v. *Levy* (La.), 99 So. 859; *Dunn* v. *Bank* (Miss.), 67 So. 20.

Where a series of notes are secured by one trust deed, the holders of the notes are entitled to share *pro rata* in case the security is not sufficient to pay all. *Green* v. *Morris,* 117 Miss. 635, 78 So. 550; *Banking Co.* v. *Young* (La.), 65 So. 611 (citing many cases).

Both general and special demurrers may be filed, and one demurrer may be sustained and another allowed. *White* v. *Thomas,* 52 Miss. 52; Story's Equity Pleading, sec. 444; *Pleasants* v. *Glasscock,* S. & M. Ch. 17; *Fall* v. *Hafter,* 40 Miss. 600; *Darby* v. *Lake,* 46 Miss. 109. If a general demurrer is sustained in one particular it is sustained altogether. *Canton Warehouse Co.* v. *Potts,* 68 Miss. 637.

No relief can be afforded on cross-bill where the alleged debtors are not parties to the suit. Code 1906, sec. 4013, (Hemingway's Code, sec. 2575.)

A demurrer to a cross-bill is properly sustained where the bill sets up new matter not material to the case. *Gilmer* v. *Felhour,* 45 Miss. 627; *Brooks* v. *Martin,* 62 Miss. 217; *District Grand Lodge* v. *Leonard,* 92 Miss. 777; *Stansel* v. *Hahn,* 96 Miss. 616.

Where a mortgage secures a series of notes and provides that the entire debt shall become due on default of any note, the mortgagee may sue for the whole debt when payment of any note is defaulted, but the holder of such notes cannot sue upon any note before maturity un-

less the parties so contract expressly. *Taylor* v. *Trust Co.,* 71 Miss. 694; *White* v. *Miller* (Minn.), 54 N. W. 736; *McClelland* v. *Bishop,* 42 Ohio St. 113; *Caldwell* v. *Kimbrough,* 91 Miss., 877.

Where securities are pledged to a bank in a particular transaction or series of transactions, it has no lien for any other purpose or right to set them off against some other indebtedness. 3 R. C. L., pars. 214, 219; R. & E. Enc. Law (1 Ed.), 733; *Smith* v. *Hall,* 67 N. Y. 48; *Thomas* v. *Bank* (La.), 101 So. 315.

Set-off cannot be availed of where there is no mutuality of indebtedness, or where defendant denies plaintiff's debt. 3 R. C. L., par. 219; Griffith on Chancery Practice, par. 521; *Shewalter* v. *Ford,* 34 Miss. 417; *Hoover* v. *Humphrey,* 107 Miss. 810; *Henry* v. *Hoover,* 6 S. & M. 418.

Argued orally by *Oscar Johnston* and *F. H. Montgomery,* for appellant, and *J. W. Cutrer* and *J. M. Stevens,* for appellee.

McGOWEN, J., delivered the opinion of the court.

Earl Brewer, as complainant, filed his bill in the chancery court of Coahoma county and sued out an attachment therein against the Canal-Commercial Trust & Savings Bank, a nonresident corporation domiciled and doing business in New Orleans, La., and also naming as defendants C. G. and B. K. Bobo and the Bank of Clarksdale, all in the Second district of Coahoma county, Miss. The bill alleged that the complainant, Brewer, was ·the owner of notes described as the Bobo and Gates notes, and that these notes were in the hands of the resident defendants, and that he was entitled to the possession of the notes as well as a judgment against the Canal-Commercial Trust & Savings Bank for the amount collected thereon. The bill charged that these six notes (the Bobo and Gates notes) had been by the complainant, Brewer,

pledged as collateral security for the payment of his note to the Canal-Commercial Trust & Savings Bank for three hundred twenty-five thousand dollars dated February 1, 1921, and held by said bank in accordance with a pledge agreement of same date entered into by and between Earl Brewer and the Canal Bank. The bill charged that complainant had paid his note about June, 1923, and that upon the payment of his note he was entitled to the possession of the collateral pledged to secure same, and that the Canal Bank declined to surrender the Bobo and Gates notes to him upon the payment of the original debt, for all of which the Bobo and Gates notes were pledged as collateral security.

The bill was also filed against the Hibernia Bank & Trust Company of New Orleans, La., but upon agreement of parties the Hibernia Bank & Trust Company was released by a decree of the court, and the Bank of Clarksdale, as garnishee defendant, turned over these notes to the clerk of the court as receiver, and the litigation proceeded as though the Canal Bank was the only defendant; it assuming to conduct the litigation as though the Hibernia Bank & Trust Company had no interest in the collateral involved or in the debt upon which the bank claimed to hold the Bobo and Gates notes as collateral.

Complainant further charged that the defendant, the Canal Bank, sought to hold his collateral under the written pledge agreement as collateral for the note of W. P. Holland, and that he was not bound by his indorsement of the note of W. P. Holland, which was on its face for five hundred thousand dollars, but which by the pledge agreement of February 1, 1921, was reduced by payment then made by Earl Brewer to two hundred sixty-three thousand dollars. Briefly stated, the bill charged that the Canal Bank had secured the signature of Earl Brewer as indorser on said Holland note by fraudulent statements made to him by a representative of the bank on the date of his signature thereon; that

he was not bound legally by his signature on said Holland note because of the alleged fraud in fact or fraud in law; that he was released in law from any obligation by virtue of his signature on said note or his pledge of his collateral in payment' of the said Holland indebtedness.

The bill then traced the execution of a note by Earl Brewer for two hundred thousand dollars to the Planter's Bank of Clarksdale and the placing of these Bobo and Gates notes as collateral for this two hundred thousand dollar note, which in turn had by Holland, formerly president of the Planters' Bank of Clarksdale, been purchased from his bank and deposited with the Canal Bank at New Orleans as collateral security for his (Holland's) five hundred thousand dollar note.

To state all the pleadings and proof taken in this case would cover an entire volume of our Mississippi Reports, and so we shall set out only the main points and make only such reference as is necessary to a decision of the case.

The Canal Bank answered and admitted that it held the Bobo and Gates notes and had sent them to the Bank of Clarksdale for collection, but alleged that it had a right to hold said notes because of Brewer's indorsement on February 1, 1921, of the Holland five hundred thousand dollar note; it further said that in addition to holding Brewer's two hundred thousand dollar note on said date, it (the Canal Bank) held as collateral to the Holland note a certain series of notes called the Glidden-Townsend and McNally notes, which was a series of notes of about four hundred thousand dollars each, due January 1, 1926, and anually thereafter until January 1, 1930; that Glidden-Townsend and McNally had purchased from the Richardson-May Land & Planting Company two plantations and executed their notes for about eight hundred thousand dollars to the Richardson-May Land & Planting Company, which notes were secured by a first mortgage on these plantations; that

the land and planting company discounted these notes to the Planters' Bank, and either at the time or later were indorsed by Governor Brewer and Ed Brewer; that the first half of the series of these notes were pledged thereafter by W. P. Holland, president of the Planters' Bank of Clarksdale, to the Missouri State Life Insurance Company, and the remainder of the notes above described were by Holland pledged to the Canal-Commercial Trust & Savings Bank for the payment of the five hundred thousand dollar note above described.

The money was obtained by Brewer by the sale of the bonds of Tchula Stores (Inc.) in the amount of seven hundred thousand dollars, which bonds were handled or purchased by the Canal Bank apparently at a profit, and the bank here defends that if it had known that Brewer would contest his indorsement of the Holland note, it (the bank) would not have "financed" the Tchula Stores bonds, and pleads an estoppel as against Brewer to assert that the Holland note was not binding and valid.

The Canal Bank alleged that the transaction on February 1st by which Brewer took up his note for two hundred thousand dollars, and his cousin Ed Brewer's note for twenty-five thousand dollars, and received credit on the books of the bank for one hundred thousand dollars cash, was a recasting or "revamping" of Brewer's indebtedness to the Canal Bank, and that there was sufficient consideration for Brewer's indorsing the Holland note; denied any charge of fraud. And the Canal Bank filed its cross-bill in which it sought to set up: First, that Brewer as president of the Richardson-May Land & Planting Company had dissipated the assets of that corporation, which assets consisted of the proceeds of the Glidden-Townsend-McNally notes discounted at the Planters' Bank, and asked for an accounting as the holder of the notes to become due beginning January 1, 1926, and ending January 1, 1930, for about four hundred thousand dollars; second, the cross-bill sought to have the title to the Bobo and Gates notes vested in

the cross-complainant, the Canal-Commercial Trust & Savings Bank; and, third, the bank sought to have the Glidden-Townsend-McNally notes decreed by the court as a set-off as against the claim of Brewer to the Bobo and Gates notes.

The chancellor sustained a demurrer to so much of the cross-bill as sought to set up the Glidden-Townsend-McNally notes as a set-off, and to so much of the bill as undertook to have relief upon the affirmative defenses set up in the answer, but held the cross-bill good as to an effort to have an accounting upon the charge that Brewer had dissipated the assets of that corporation, and being insolvent, they were entitled to an accounting upon these Glidden-Townsend-McNally notes, and upon which proof was taken, but, analyzed, the only testimony shedding light upon the transaction which occurred in the making of the loan to Brewer and pledge of these notes in controversy by Brewer was the testimony of Brewer and Gunter, an officer of the Canal Bank. There was sharp conflict between these two witnesses, and the chancellor held as to the matters of fact alleged in the original bill of complaint that the burden of proof was upon the complainant, and that there was no fraud shown because that burden had not been met.

On the other hand, the chancellor held that on an affirmative defense of estoppel there was no estoppel, because the burden was upon the Canal Bank, which was represented by Gunter throughout this transaction.

The chancellor further held that the charge that there had been dissipation by the bank of the securities supporting the Holland note was not sustained. The chancellor held that the sole consideration supporting the indorsement by Brewer of the W. P. Holland note was the loan of three hundred twenty-five thousand dollars made on February 1, 1921, by the Canal Bank to Earl Brewer, and that the Canal Bank having charged on the said three hundred twenty-five thousand dollars the full highest contract rate of interest permitted by

law in addition to the indorsement by Brewer of the Holland note rendered said indorsement usurious, unlawful, invalid, and not binding on Brewer; that the evidence offered by the Canal Bank was insufficient to support the plea of estoppel; that the pledge contract dated February 1, 1921, signed by Earl Brewer and the Canal Commercial Trust & Savings Bank, was not intended to secure the payment of the liability of Brewer as indorser on the Glidden-Townsend-McNally notes.

The decree of the court below thereupon awarded the possession of the Bobo and Gates notes to the complainant Earl Brewer, and rendered a decree for fifty-one thousand nine hundred sixty dollars, the amount collected on the collateral between the time of payment, about June, 1923, and the date of hearing by the Canal Bank.

The pledge agreement about which this lawsuit clusters recites as follows:   That "the party of the first part *is borrowing* (italics ours) from the party of the second part the sum of three hundred twenty-five thousand dollars, and the party of the first part is depositing in addition to other collateral," etc.   Then follows a long description of collaterals which are described as being listed in "Exhibit A," and after reciting that they were pledged to secure a note that was executed for three hundred twenty-five thousand dollars, uses this language:

"And is also pledged as collateral to secure the balance of two hundred sixty-eight thousand five hundred forty dollars and eighty-three cents owed by W. P. Holland to the party of the second part on which note the party of the first part is indorser, and is also intended to secure any other indebtedness that the party of the first part may owe to the party of the second part. The note of W. P. Holland indorsed by the party of the first part is also secured by certain collateral, a list of which is hereto attached marked 'Exhibit B,' as a part of this contract."

This pledge contract was signed by Earl Brewer and by the Canal-Commercial Trust & Savings Bank, by E. F. Gunter, vice-president. Exhibit A to the contract was a list of securities put up by Earl Brewer in support of the pledge contract. Exhibit B represented a list of securities furnished by Gunter to Brewer on that date which Holland had placed as collateral security for his five hundred thousand dollar note.

This Exhibit B being a lengthy list, we only mention three items: First, the Glidden-Townsend-McNally notes referred to in the statement of pleadings; also special attention should be called to this item, certificate No. ———, five thousand shares preferred stock in Yazoo-Delta Mortgage Company; also the right, title, and interest in a certificate of deposit held by W. P. Holland for one hundred fifty-five thousand dollars in the Planters' Bank of Clarksdale, Miss., it being recited in the pledge agreement that Mrs. Florence T. Holland had fifty thousand nine hundred thirty-eight dollars and seventy-two cents interest in the certificate of deposit.

On the witness stand Brewer contended that Gunter, representing the bank, told him that this five hundred thousand dollars worth of preferred stock in the Yazoo-Delta Mortgage Company had been paid for by the bank a few days prior to this transaction, that the money had been furnished by Gunter for the bank, and that the money of the Yazoo-Delta Mortgage Company was then in the vaults of the bank, and that the stock was perfectly good, when the truth was that Gunter had already depleted the capital stock of the Yazoo-Delta Mortgage Company by turning over to it frozen assets consisting of farm lands owned by the Planters' Bank of Clarksdale, and that the security at the time was worthless. He also contended that the certificate of deposit was not then in the bank, and that the Canal Bank permitted Holland and others to dissipate this security which on

its face appeared to be a certificate of deposit in a going bank for one hundred thousand dollars.

The chancellor having found the facts against this contention of complainant, it is here urged that the mere listing of a certificate of deposit in a bank in Mississippi and of preferred stock in a corporation propagated by the defendant bank constitutes a fraud in law, even if Gunter made no representation that it was his duty as pledgee to Brewer as pledgor to reveal the true state of facts, but these very serious questions are pretermitted by us in view of the fact that this case is solvable by the laws of Louisiana, and the laws of Mississippi are not involved in view of the conclusion which we have reached.

Mr. Gunter testified that he "required" Brewer to sign the note of Holland, which note had been executed nearly thirty days before Brewer indorsed it, and was indorsed by Brewer without the solicitation or knowledge at the time of Holland, the maker of the note. As to the consideration for the Holland indorsement, the pledge agreement states positively that Brewer was borrowing and necessarily the bank was lending the sum of three hundred twenty-five thousand dollars. There was no other consideration save the making of this loan, and we are not relegated to the oral testimony of the shrewd lawyer and astute banker in their battle of words upon this, the crucial point in the case, because it was at the time reduced to writing.

Was the chancellor correct in holding the pledge contract for the payment of eight per cent. interest and the signing of Holland's note a violation of the usury laws of Louisiana? Section 1893 of the Louisiana Civil Code 1900 provides:

"An obligation without a cause, or with a false or unlawful cause, can have no effect."

Section 2924 provides:

"*Legal, Conventional Interest: Rate. Penalty for Usury.* Interest is either legal or conventional. Legal

interest is fixed at the following rates, to-wit: At five
per cent. on all sums which are the object of a judicial
demand, whence this is called judicial interest. And on
sums discounted by banks, at the rate established by
their charters. The amount of the conventional inter-
est cannot exceed eight per cent. The same must be
fixed in writing; testimonial proof ˙ . . . is not ad-
mitted in any case. Except in the cases herein provided,
if any person shall pay on any contract a higher rate of
interest than the above, as discount or otherwise, the
same may be sued for and ˙ recovered within twelve
months from the time of such payment.''

It will be borne in mind that this indorsement was
required of Brewer on the making of this loan and was
made by Brewer without the knowledge or consent of
Holland, the maker, some time after its execution. We
set out at length the controlling case from Louisiana,
*Canal Bank* v. *Hagan,* 1 La. Ann., page 62:

''The material facts of this case are as follows: On
the 22d May, 1839, John Hagan executed a notarial act
of mortgage in favor of the Canal Bank and the Ex-
change Bank, for loans made to him by these corpora-
tions respectively, being twenty thousand dollars by the
Exchange Bank, and twelve thousand dollars by the
Canal Bank. Two notes were given by Hagan for these
amounts, each payable at one year from the date of the
act; the one of twenty thousand dollars, to the order of
the Exchange Bank, bearing seven per cent. per annum
interest, from date till final payment, and the one of
twelve thousand dollars, to the order of the Canal Bank,
bearing interest at eight per cent. per annum, from date
until final payment. Hagan acknowledges the receipt
of the full amount of the respective loans in cash, on
the day on which the act and notes were executed.

''On the 25th May, 1839, being three days subsequent
to the giving of the mortgage, and the receipt of the
above loans, Hagan executes another act of mortgage,
before the same notary, in favor of the same banks, upon

the same real estate. The debts to be secured, and the circumstances under which the mortgage was agreed to be given, as well as the extent of Hagan's contract, will be best exhibited by citing the language of the act:

" 'Personally came and appeared John Hagan, of this city, who declared that Messrs. Hagan, Niven & Co., Buchanan, Hagan & Co., and Thomas Barrett & Co., of this city, merchants, are justly and truly indebted unto the Exchange and Banking Company of New Orleans, as follows, to-wit, the said firms of Hagan, Niven & Co., and Buchanan, Hagan & Co., jointly, in the full sum of twenty-one thousand dollars, and the said firm of Thomas Barrett & Co., in the full sum of sixty thousand dollars, to secure the payment of which debts, the said firms have respectively furnished and delivered certain collateral securities now in the possession of, and held by the said company. And, furthermore, that the said Hagan, Niven & Co., are justly and truly indebted unto the New Orleans Canal & Banking Company, in the full sum of twenty-six thousand five hundred eight dollars and eighty-five cents, for which they have furnished their promissory note, drawn to the order of, and endorsed by the said Buchanan, Hagan & Co., dated on the second day of August, 1838, and made payable on the eighth day of August, 1840, fixed, to secure the punctual payment of which note, he, the said appearer, granted a special mortgage in favor of the said New Orleans Canal & Banking Company, on certain property situated in this city, by an act passed before William Christy, a notary public in this city, on the 2d day of August, 1838; and whereas the said companies have loaned unto him, the said appearer, the aggregate sum of thirty-two thousand dollars, that is to say, the sum of twenty thousand dollars by the said Exchange & Banking Company, and the sum of twelve thousand dollars by the said New Orleans Canal & Banking Company, to secure the payment of which amounts, he, the said appearer, granted a special mortgage in favor of the said companies respective-

ly, on certain landed premises, by an act passed before me, notary, on the 22d day of May instant, which loans were made and granted as aforesaid, on the express condition and with the understanding, that he, the said appearer, should still further secure the payment of the debts and liabilities due and owing by the said firms respectively, to the said companies, as hereinbefore mentioned, by granting another special mortgage in favor of said companies on the same landed premises, last above referred to and mentioned.

" 'Now, therefore, in consideration of the premises, and in order to secure the full and final payment of the above mentioned and recited debts and liabilities, within the space and term of three years, to commence and be computed from the date thereof, he, the said John Hagan, moreover declared, that he does, by these presents, mortgage, affect and specially hypothecate, in favor of the said Exchange & Banking Company of New Orleans, and New Orleans Canal & Banking Company, both duly incorporated institutions of this state, in the proportion of the amounts to them respectively due and owing by the above-mentioned firms, all and singular the following described property, to-wit.

"Then follows the description of the property, and the act proceeds: 'And the said John Hagan, doth hereby bind and obligate himself not to sell, alienate, nor incumber the hereinbefore described and mortgaged premises, nor any part thereof, to the prejudice of this mortgage. And doth moreover, by these presents, confess judgment for the amounts of the said debts and liabilities of the said firms respectively, as hereinbefore set forth and expressed; and agrees that, in case of nonpayment of the same, as herein stipulated, the law in such cases made and provided, may be strictly enforced and summarily put into execution. It being, however, agreed and expressly understood by and between the parties hereto, that the said companies shall not proceed against the said described property, and attempt to make the same

liable under the present mortgage now being granted, until they shall have first exhausted the collaterals and mortgage securities now in their possession and herein above referred to and mentioned, ·or made all due and reasonable efforts to realize and make good the same.'

"The Exchange Bank having become insolvent, its affairs were placed in the hands of commissioners, who, in 1844, made a sale at public auction of its assets. At this sale Adams became the purchaser of four notes of Thomas Barrett & Co., indorsed by Hermann, Briggs & Co., amounting in all to a principal sum of fifty-four thousand eight hundred fifty dollars, the whole adjudicated at the price of two hundred ten dollars. Preston became the purchaser of two notes of Buchanan, Hagan & Co., indorsed by Hagan, Niven & Co., amounting to a principal sum of six thousand one hundred dollars, at the price of two hundred dollars; of four notes of J. B. Marks, indorsed by Hagan, Niven & Co., amounting to a principal sum of one thousand and sixty dollars, at the price of forty dollars; and of a draft of Buchanan, Hagan & Co., on Redmond, and Hagan, Niven & Co., for a principal sum of five thousand five hundred dollars, at the price of thirty dollars. These assets accord with the principal sum of sixty-seven thousand five hundred ten dollars claimed by Adams and Preston, as above stated. After the adjudications, Adams and Preston entered into an agreement of equal partnership in the assets thus purchased. Adams, however, discontinued, as to himself, the claims set up in this suit, during the progress of the trial.

"The first point of defense urged by Hagan is, that the obligations or debts thus purchased by Adams and Preston, are not the debts which the mortgage of 25th May, 1839, was given to secure. This point was laboriously contested in the court below. We do not consider it indispensable now to examine it; and assuming, therefore, for the purposes of our present inquiries, the iden-

tity of the indebtedness, we proceed to the second point of Hagan's defense.

"Preston contends that the act of 25th May, 1839, imposes on Hagan a personal responsibility for the indebtedness of the parties therein recited: Hagan, on the contrary, maintains that by that act he did nothing more than mortgage his property.

" 'It is not necessary that the mortgage should be given by the person contracting the principal obligation; it may be given for the contract of a third person.' Civil Code, article 3262.

" 'When a person has given a mortgage on his property for the obligation of a third party, it is necessary to inquire whether he only gave the mortgage, or whether he bound himself personally for the fulfillment of the obligation.' Ibid, article 3263.

" 'In the former case, that is if he has only mortgaged his property to secure the fulfillment of an obligation by a third person, no right of action exists against him personally, but merely an action of mortgage against the thing, to have it seized and sold, so that, if it perishes, he who mortgaged it shall be released from every species of obligation.' Ibid, article 3264.

" 'On the other hand, if the person who has given a mortgage for another, has bound himself personally for the fulfillment of the obligation, independently of the mortgage, there shall exist against him a right of personal action, and he shall not be released, even if the thing mortgaged should perish.' Ibid, article 3265.

"The question, then, is a question of intention, to be solved by a just and reasonable interpretation of the whole instrument, and the expressions therein used by the parties. Though the several debtors to the bank, recited in the act, had given notes, Hagan was not required to endorse them. In the recitation of the agreement upon which the loans of twelve thousand dollars and of twenty thousand dollars were made, the language is not that he shall personally bind himself, but that he shall

still further secure the debts and liabilities of the said firms, by granting another special mortgage in favor of said companies on certain real estate.

"The mortgaging clause declares that 'in consideration of the premises,' that is, the preexisting agreement thus recited, and in order to secure the full and final payment of those debts of the firms named, he mortgages, affects and specially hypothecates the described property.

"In the stipulations for time, it is agreed that the bank shall not proceed against the mortgaged property until the lapse of three years, nor until they shall first exhaust certain collaterals. If Hagan had intended to be personally bound, we cannot believe he would have omitted to stipulate for a like freedom from personal pursuit.

"The clause of confession of judgment, is much relied on by Hagan's adversary. That clause is found in its usual position in the notarial act, to-wit, in that portion which provides safeguards and remedies for the enforcement of the mortgage. It follows the pact *de non alienando*, which is a clause intended to relieve the mortgagee from the necessity and delay of action against a subsequent purchaser. The object of the confession clause is to give in distinct terms the remedy of executory process against the land. Such a clause does not authorize a *fieri facias* against the mortgagor's other property, nor a registration in the nature of a judicial mortgage. It is, in our opinion, a mere provision that concerns the mortgagee's remedy against the hypothecated property.

"Again, in the accepting clause of the act, the language is, the presidents of the respective banks, etc., 'do by these presents accept the foregoing mortgage, with all and singular the rights, benefits and privileges resulting therefrom.'

"Suretyship is construed strictly. The law favors the surety. 'Suretyship cannot be presumed; it ought to be

expressed; and is to be restrained within the limits intended by the contract.' Civil Code, article 3008. Suretyship does not operate a mortgage on the property of the surety, unless there has been an express agreement. Civil Code, article 3010. And, by parity of reasoning, a mortgage of property as security, should not operate the personal responsibility of the mortgagor, unless so expressly declared.

"We, therefore, are of opinion that Hagan contracted personal liability for the debts thus proposed to be secured. But, however this may be, the first and second points above stated are merged in the third point, which we now proceed to consider.

"In opening the argument on the question of usury, the counsel for Hagan, aware that this plea is usually an odious one in public opinion, and is also scanned with something like disfavor by courts of equity, has defended the reputation of his client, by suggesting that Hagan has never sought to invalidate, as he says he might successfully have done, the claim of the Canal Bank for its full debt of twelve thousand dollars and eight per cent. interest, and that he has only taken refuge under this plea, at a late period of the trial, to aid himself in resisting a vigorous effort made by his adversary to impose upon him a personal liability for debts amounting, in principal alone, to sixty-seven thousand five hundred ten dollars, and bought by his antagonists for four hundred seventy dollars. This is a question which concerns the reputation of Hagan, rather than the legal merits of this controversy; but it is perhaps just to say in passing, that the remarks of the counsel with regard to his client's motives and conduct, seem justified by the record.

"The intervener has strenuously contended that a lawful consideration for the mortgage of 25th May, 1839, is to be found in the delay which he says is accorded to the embarrassed merchants, the friends and relatives of Hagan, whose debts are thereby secured. An examination of

the act has not satisfied us that such delay was thereby stipulated in favor of those parties. It is true that, under the article of the Code which he has cited, a person may, in his own name, make some advantage for a third person the condition or consideration of a commutative contract; and, if such third person consents to avail himself of the advantage stipulated in his favor, the contract cannot be revoked. But has there been such a stipulation here? The stipulation is: ''That the said companies shall not proceed against the said described property, and attempt to make the same liable, under the present mortgage now being granted, until they shall have first exhausted the collaterals and mortgage securities now in their possession, and hereinabove referred to and mentioned, or made all due and reasonable efforts to realize and make good the same.' In a preceding part of the act, upon which the counsel relies, is also to be found this expression: 'To secure the full and final payment of the debts and liabilities of the firms within three years from the 25th May, 1845,' Hagan grants the mortgage, etc.

''We do not see in these expressions and stipulations a contract by the banks which would have inhibited them from immediate action against those debtors. The natural and fair construction is this: I, Hagan, for the loan you have given me, not only have promised to pay the loan, and seven per cent. interest, but I also agreed to give, and now give you a mortgage on my own property to secure the full and final payment of the debts due by the firms mentioned; but you must not resort instantly to my property, but only after a certain period, and after having done your best to exhaust other securities.

''In defining the nature and extent of suretyship, our law expressly declares that, while it cannot be contracted under more onerous conditions than are imposed on the principal debtor, yet it may be under more favorable conditions. *Si ille pure promisserit, fidejussor sub conditione promittere potest. Non solum autem in quanti-*

143 Miss.—12.

*tate, sed etiam in tempore minus aut plus intelligitur. Plus est enim statim aliquid dare; minus est post tempus dare.* There is nothing in the instrument which shows an intention on the part of either Hagan or the banks, to disarm them of their power against the principal debtors.

"Not only is there no delay given to these debtors, and no statement in the act of mortgage that such delay is its consideration, but the mortgagor and the mortgagees have themselves declared, in express and unequivocal terms, which exclude all implication and conjecture, the real and true consideration for which the mortgage was given. The act announces in language susceptible of no misconstruction, that the loans of the 22d May, 1835, 'were made and granted as aforesaid on the express condition, and with the understanding, that, he, the said appearer, should still further secure the payment of the debts and liabilities due and owing by the said firms respectively to the said companies, as hereinbefore mentioned, by granting another special mortgage in favor of said companies on the same landed premises last above referred to and mentioned. Now, therefore, in consideration of the premises,' etc., Hagan, to secure the debts, etc., mortgages, etc.

"The mortgage, then, is given in fulfillment of the recited promise, and its consideration is the loans made. on the 22d May, three days previous. What, then, was the consideration given by Hagan, for the loan made to him by the Exchange Bank?

"(1) He promises to pay, at the end of one year, the principal sum loaned.

"(2) He promises to pay seven per cent interest on said principal sum.

"(3) He gives a mortgage on lands to secure the payment of principal and interest.

"(4) He promises (and three days after fulfills that promise), to give the Exchange Bank a mortgage on the same lands, to further secure the payment of the debts

of third persons to said bank, amounting to eighty-one thousand dollars.

"Is this last branch of the contract, to-wit, the mortgage to secure the payment of those debts due by third persons, void?

"The charter of the Exchange Bank contains the following provisions: 'That the said company shall not take more than seven per centum per annum upon any of its loans or discounts; nor shall it take more than six per centum per annum upon any of its loans or discounts made on promissory notes, which shall be payable at four months, or less, after such loan or discount.'

"According to all reasonable rules of interpretation, we consider an agreement to take, and a taking, as equally covered by the statute. The bank, then, is not only incapable of making an agreement to take more than seven per cent interest on a loan, but it is prohibited from so doing. The statute is a prohibitory statute. It rests on grave considerations of public policy, and whether that policy be unsound, as the counsel suggests in argument, or sound, we are not permitted to enquire. Being a prohibitory statute, if the agreement made by Hagan, to give the mortgage of the 25th May, and the subsequent execution of that agreement, be an evasion of, and a fraud upon the statute, no court of justice can enforce it.

"Is it, then, such a violation? The mere statement of the case carries its own answer with it. The bank stipulated for seven per cent interest; in stipulating that the further mortgage should be given, it stipulated for something more than seven per cent interest, and when that stipulation was fulfilled, three days afterwards, it received more. It received a mortgage for the further security of eighty-one thousand dollars, due to it by third persons.

" 'A profit made, or loss imposed upon the necessities of the borrower, whatever form, shape, or disguise it may assume, where the treaty is for a loan, and the capital is

to be returned at all events, has always been adjudged to be so much profit upon a loan; and to be a violation of those laws which limit the lender to a specified rate of interest.' *Owen's case,* 2 Pet. 537 [7 L. Ed. 508.]

"Here the bank, taking advantage of the necessities of Hagan, who was pressed with an enormous load of debts, and particularly by a debt to Le Breton, of thirty-six thousand dollars, maturing in the latter part of May, 1839, the price of the land subsequently mortgaged to the bank, extorts from him, in addition to the highest rate of interest allowed by its charter, a mortgage for an enormous debt due by third persons. That the partners in these houses were, as suggested by the intervener, Hagan's relatives and friends makes the case against the bank stronger rather than weaker, since, as we have seen, there was no stipulation for their benefit. It was taking advantage not only of Hagan's necessities, but of his affection and family pride.

"There can be no legal remedy for that which is illegal, and as the Exchange Bank could not have enforced this mortgage, the intervener, supposing him to have purchased the rights intended to be conferred by the hypothecary contract of Hagan, can stand in no better position. 'No court of justice,' said the learned judge in Owens' case, 'can be made the handmaid of inequity. Instituted to carry into effect the laws of a country, how can it become auxiliary to the consummation of violations of law?'

"In principle, it is impossible to distinguish Owens' case from the present. The Bank of the United States, as the Exchange Bank, was prohibited from taking more than a certain rate. By the discount of the note, she did evasively take a greater rate by a profit on depreciated paper given to the borrower at its nominal value, instead of cash, and the case was decided upon the prohibitory clause in the charter, and without reference to the usury laws of Kentucky, where the contract was made'.

*"Judgment affirmed."*

This Hagan case is controlling, and the contract of pledge was in violation of the rule of law therein announced. This was a contract the substance of which was the loan of money to Brewer, and, in addition, at the highest rate of interest. According to Mr. Gunter's testimony, he "required" Brewer to execute this indorsement; and this is especially true when Gunter declares in effect that he was undertaking to strengthen the bank's position and not looking after Brewer.

The Hagan case is strengthened by the announcement of the same court in the case of *Bank of Louisiana* v. *Briscoe,* 3 La. Ann. at page 157. The pledge agreement is plain and unambiguous, and the law must be applied when both facts and law are clear.

It is insisted by the defendant bank that Brewer is estopped to set up this usury claim because Mr. Gunter says in his testimony that he would not have made the deal by which the bonds of the Tchula Stores (Inc.) were issued by Brewer, representing that corporation, and taken over by the Canal Bank, from which Brewer received the money with which he paid the three hundred twenty-five thousand dollar note.

The burden of proof was on the defendant to establish this affirmative defense. We hardly think it is necessary for us to devote time to the proposition that estoppel must arise from some word spoken, some act done, or some failure to speak when called on to speak, none of which elements appear in the Tchula Stores bond issue deal. It appears to us quite clearly that Mr. Gunter was not overreached or mistaken in any fact in the bond issue deal; but, on the other hand, the proof amply sustains us in the statement that by commissions, the collection of a large amount of indebtedness, and security of thousands of acres of Delta land, the bank was in no wise harmed or injured by Brewer in that transaction, but Brewer was then in a position where he had to sign on the dotted line as required by Gunter.

It is also urged that the renewal of the three hundred twenty-five thousand dollar note relieved the defendant of the charge of usurious exaction of interest, but the bank continued to carry Brewer's indorsement of the Holland note and required Brewer to pay the highest conventional rate of interest permitted by the laws of Louisiana, thus accentuating rather than mitigating the offense of usury.

It is next contended that error was committed in sustaining the demurrer to parts of the cross-bill of the Canal Bank. It is very clear to us that this error of the chancellor was in the cross-complainant's favor.

In our opinion the theory of the cross-bill rested upon the presentation of Brewer's indorsement of the Glidden-Townsend-McNally notes as a set-off to the asserted claim of Brewer to the Bobo and Gates notes. The demurrer should have been sustained to the entire cross-bill, as it is not maintainable in any event although the chancellor found the facts against the cross-complainant, the Canal Bank.

The Glidden-Townsend-McNally notes were not the primary obligation of Earl Brewer. He was secondarily liable thereon. At the time of the payment of his note for three hundred twenty-five thousand dollars not a one of these notes were due, the first one becoming due January 1, 1926, and annually thereafter until January 1, 1930. There was no course of dealing between the Canal Bank and Earl Brewer with reference to these notes. Consequently there was no mutuality of dealings between these parties and no connection between the indorsement of Brewer of these notes and the collateral security (the Bobo and Gates notes) held by Brewer in the Canal Bank for the payment for his own personal note.

Set-off cannot avail where there is no mutuality of indebtedness and where the defendant denies plaintiff's debt. 3 R. C. L., par. 219; *Henry* v. *Hoover,* 6 Smedes & M. 418; *Shewalter* v. *Ford,* 34 Miss. 417; *Hoover Com-*

*mercial Co.* v. *Humphrey,* 66 So. 214, 107 Miss. 810. As sustaining this proposition, Judge Griffith, in Mississippi Chancery Practice, section 521, clearly states the rule as follows:

"*When and How Set-Off is Available under the Statutes.*—If the set-off under the statute is to be used only in defense to the cause set out in the bill, the set-off is preferred in the answer, but if it be for a larger demand than that sued for in the bill and a decree over is demanded then it must be by cross-bill; and in either event it must have annexed thereto the exhibits mentioned in the second section of the statutes above quoted. A set-off is not available, whatever may be the manner in which it is pleaded, if without, or independently of, the set-off the defendant make a total denial of the complainant's right of action, for the statute applies only to cases of mutual indebtedness, and there would be no mutual indebtedness for application if such a denial be true. The mutual indebtedness within the contemplation of the statute is not only one that is mutual as to parties, but there must have been also a mutual dealing so that each became indebted to the other. Mutual means reciprocally acting, giving, receiving, interchanging; and, the transactions must have been of such a nature that at the date of the institution of the suit the defendant on his part could have instituted a good separate suit against the complainant for the items constituting the set-off."

The decree of the lower court is affirmed.

*Affirmed.*